UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID TYLER HILL,<br><br>              Plaintiff,<br><br>   v.<br><br>SHELL WAMBLE-FISHER; CYNTHIA RICHMOND; SERGEANT WEBB; HEATHER DUNHAM; ARIS DUNCAN; RUSSEL NITCHALS; LIEUTENANT BUTLER; ARVEL SHEDD; JEFF HENRY; KATHLEEN NIECKO; BRENT REINKE; and IDAHO DEPARTMENT OF CORRECTION,<br><br>              Defendants. | Case No. 1:11-cv-00101-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

      Plaintiff David Tyler Hill, a prisoner in the custody of the Idaho Department of Correction (IDOC), is proceeding pro se and in forma pauperis in this civil rights action. Pending before the Court is Defendants Aris Duncan's[1] and Heather Dunnam's[2] Motion for Summary Judgment (Dkt. 61). Defendants Duncan and Dunnam are the only Defendants remaining in this action against whom Plaintiff has been allowed to proceed.

---

      [1] Since the events giving rise to Plaintiff's claims, Aris Duncan has changed her name to Aris Coleman. For convenience, this Order will use her former name, except when referencing her affidavit.

      [2] Heather Dunnam was sued under the name "Heather Dunham."

**MEMORANDUM DECISION AND ORDER - 1**

(*See* Dkt. 48 at 10, 12.)

All parties who have appeared in this case have consented to the jurisdiction of a United States Magistrate Judge to enter final orders (Dkt. 36). *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that the decisional process would not be significantly aided by oral argument. Accordingly, the Court will decide this matter on the record without oral argument. D. Idaho L. R. 7.1. For the reasons that follow, the Court concludes that there is no genuine dispute as to any material fact and that Defendants are entitled to judgment as a matter of law. Therefore, the Court will grant Defendants' Motion for Summary Judgment.

## INTRODUCTION

For approximately 30 days beginning March 18, 2009, Plaintiff was housed in C-Block, Tier Three at Idaho Maximum Security Institution (IMSI). This tier is known as C-3. C-3 is a specialized mental health treatment unit "designed to help identify an offender's acute mental health needs and to initiate appropriate treatment. Placement in C-3 is by referral only." (Dunnam Aff., Dkt. 61-7, ¶ 5.) A treatment team consisting of "a psychologist, psychiatrist, nurse practitioners, socials workers . . . , psychiatric technicians, and correctional officers" manage the care of each inmate on C-3. (*Id.* ¶ 5.)

Defendant Dunnam describes the treatment and behavioral system in C-3 as follows:

**MEMORANDUM DECISION AND ORDER - 2**

> Offenders were expected to take all prescribed medications and respect all staff and treatment team members as well as other offenders. They were also expected to follow the directions of the treatment and custody staff and the Idaho Department of Correction's rules and regulations.
>
> Offenders housed in C-3 were subject to a level system that was designed to keep them and staff safe and secure. Levels are assigned based on offender behaviors, security risk, level of functioning, program compliance, treatment participation and psychiatric presentation. There are four levels with Level 1 being the most restrictive and non-level, the least restrictive. Level 2, which was [Plaintiff's] level, does not allow personal property, which includes reading books, photo albums, bibles, personal letters and paper, although legal paperwork was allowed. Phone privileges, and access to security pens and writing paper were coordinated by treatment team staff. Offenders were not allowed any contact with other offenders. Showers and linen exchanges were done on schedule.
>
> Level status was determined by the treatment team on a weekly basis and adjusted depending upon an offender's behavior, progress with treatment, and participation for the prior week. *If an offender has not engaged in any disruptive, aggressive behavior, has been compliant with his treatment plan, which includes medication adherence, and established appropriate activities of daily living, then their offender level could be assessed for moving to a less restrictive level*.

(*Id.* ¶¶ 5-7) (emphasis added).

Defendants Duncan and Dunnam were members of Plaintiff's treatment team. Duncan was one of the psychiatric technicians, and Dunnam was a social worker. (Coleman Aff., Dkt. 61-1, ¶ 4; Dunnam Aff. ¶ 4.) Plaintiff alleges that Defendants Duncan and Dunnam violated his Eighth Amendment right to adequate mental health care during his time in C-3.

**MEMORANDUM DECISION AND ORDER - 3**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**1.      Factual Background**

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

Plaintiff's medical records have been submitted through the custodian of those records, Linda Gehrke. Plaintiff's medical records and Plaintiff's own pleadings show that he has a history of inappropriate and threatening behavior toward female staff in general, and toward one woman in particular. (*See, e.g.*, Compl., Dkt. 3, at 9.) Prior to Plaintiff's transfer to C-block, Plaintiff was ordered by a prison official to stay at least five feet away from all female staff members because he had been "stalking" and "grooming" them. (Initial Review Order, Dkt. 7, at 4.) Believing these characterizations to be unfair, Plaintiff filed a grievance that referred to "clubbing a female staff member and dragging her back to his cell." (*Id.*) Plaintiff minimizes the threat posed by his grievance, stating that this grievance was "sarcastic." (Dkt. 66-1 at 3.) He was subject to disciplinary action for this threat, but his behavior did not improve.

**MEMORANDUM DECISION AND ORDER - 4**

Plaintiff attempted suicide on March 17, 2009. As a result, Plaintiff was transferred to C-3. (Dkt. 48 at 3.) Vicki Hansen evaluated Plaintiff upon his transfer and, based on Plaintiff's denial of suicidal ideation at that time, determined that he was at low risk of suicide. Hansen noted that Plaintiff's "attempts to bully staff, inappropriate coping strategies and criminal history indicate that when thwarted, he will increase the ante by engaging in more dangerous forms of self harm." (Ex. A to Gehrke Aff., Dkt. 61-4, CMS 156.) Notwithstanding Hansen's assessment of a low suicide risk, Plaintiff was kept in a suicide watch cell for his own safety until March 20, 2009. (*Id.*, CMS 157-58, 161-63.)

On March 20, 2009, Plaintiff was evaluated by Mary Hicks, a Certified Registered Nurse Practitioner. Plaintiff wanted to continue the medication Elavil, while Ms. Hicks "suggested that [Plaintiff] try Tegretol for a mood stabilizer, continue with the order of Paxil and begin tapering off of Elavil." (Gehrke Aff., Dkt. 61-3, ¶ 9 & Ex. A, CMS 166.) At this evaluation, Plaintiff "was cooperative with [Ms. Hicks's] formulating a medicational-treatment plan and . . . agreed to give her recommendations of switching to Tegretol a try." (Dkt. 66-1 at 5.) Plaintiff was removed from suicide watch and placed in the general C-3 unit.

Plaintiff's next mental health evaluation occurred on March 25, 2009, when Dr. Michael Quattrocchi assessed Plaintiff as having Axis I disorders of depressive disorder not otherwise specified, anxiety, parasomnia with possible sleep paralysis, and a history of substance abuse. (Ex. A. to Gehrke Aff., CMS 173.) Dr. Quattrocchi also assessed

**MEMORANDUM DECISION AND ORDER - 5**

Plaintiff as having an Axis II "personality disorder, mixed, with antisocial and borderline features." (*Id.*)

Plaintiff's treatment team developed a behavioral and treatment plan for Plaintiff on April 3, 2009. (*Id.*, CMS 183, 185.) The plan addressed Plaintiff's "[v]erbal threats toward staff, inappropriate comments towards female staff, manipulating peers, and the behaviors that cause the disruption of the orderly and safe operations of the unit." (*Id.*, CMS 183.) The plan contemplated Plaintiff's development of positive behaviors, such as engaging in socially appropriate exchanges and appropriate conflict resolution skills. (*Id.*) In addition to the behavioral aspects, the plan also stressed that Plaintiff was to continue taking Paxil and Tegretol, and medication compliance was the short term goal of the plan. (*Id.*) The primary long term goals were to "improve [Plaintiff's] ability to function in a less restricted and structured environment such as Tier 2," to promote Plaintiff's "independent ability to manage symptoms and anger appropriately," and to interact with female staff in an appropriate manner." (*Id.*) Due to a prison lockdown, however, the treatment team was unable to meet with Plaintiff regarding the plan on April 3, and the plan review meeting was rescheduled. (*Id.*, CMS 182.)

On April 7, Plaintiff's treatment team discussed the plan with Plaintiff, who refused to accept the plan. (*Id.*, CMS 185.) Plaintiff stated to Defendant Dunnam that "there was not a chance in hell he would agree to" the treatment plan. Plaintiff's current explanation for his refusal was that the treatment plan was developed "two weeks after

**MEMORANDUM DECISION AND ORDER - 6**

[he] had arrived at [C-3] at which time my mental [state] had deteriorated to point [sic] where I had thoughts of harming myself again." (Dkt. 66-1 at 6.)

It is not genuinely disputed that Plaintiff made vulgar and threatening comments to Defendant Duncan during his time in C-3. These statements included the following:

> "You're a fucking whore you bitch."
>
> "I swear to god I am going to fucking take you out you whore."
>
> "What do I have to do to get a level change, throw shit and piss on you?"
>
> "Screw you, you fucking cunt. You're going to get what's coming to you."
>
> . . . .
>
> "You're the one who won't let me have a phone call, aren't you bitch? It's all your fucking fault. You have no rights here, you are treating me like a prisoner at Guantanamo Bay."

(Coleman Aff. ¶ 12.)

Defendant Duncan also documented the following statements that Plaintiff made to other female staff members: "Fuck you whore, I will fist fuck you like you want it. You like uncircumcised men don't you? Let me see your saggy tits." (Ex. A to Gehrke Aff., CMS 187.) Again, Plaintiff's explanation for his vulgar and threatening statements is that his "emotional state was greatly agitated which caused me to have . . . uncontrolable [sic]

**MEMORANDUM DECISION AND ORDER - 7**

fits of anger and depression."[3] (Dkt. 66-1 at 6-7.)

Defendant Dunnam attempted to speak to Plaintiff again about the behavioral and treatment plan on April 8, but Plaintiff refused to discuss it. (Ex. A. to Gehrke Aff., CMS 187.) Two days later, Plaintiff initially appeared to accept the plan, but was dismissed from the team meeting when he began to "taunt[] staff to engage in arguments . . . as that behavior would not be tolerated." (*Id.*, CMS 188.) Plaintiff was then given the treatment plan to review on his own. (*Id.*)

On April 13, 2009, Plaintiff was evaluated by a psychiatrist, Dr. Sheryl Salaris. The evaluation was conducted by video-teleconferencing, to which Plaintiff consented. (Ex. A to Gehrke Aff., CMS 192, 193.) Dr. Salaris reported that Plaintiff had a "chronic risk of self-injury" and was "not expected to improve significantly in [the] near future" because he was not motivated to change his behavior. (*Id.*, CMS 193.) She also decided to taper off Plaintiff's Tegretol, apparently due to the side effects he was experiencing. (*Id.*) Although Dr. Salaris described Plaintiff as having Axis I disorders of depression not otherwise specified and anxiety, it was not clear that his "complaints of anxiety and mood disturbances are in excess of those explained by character pathology and situation." (*Id.*) It was also unclear at Plaintiff's evaluation whether his behavior was motivated by a

---

[3] For his part, Plaintiff does not deny that he called staff members names and yelled obscenities at them, but he claims in general that he "did not say some of the vulgar things that only the defendants claim [he] said" and that he did not threaten anyone. (Dkt. 66-1 at 7.) However, because Plaintiff does not identify any of the statements set forth above as being inaccurate, the Court concludes that Plaintiff's dispute about the statements attributed to him is not genuine.

**MEMORANDUM DECISION AND ORDER - 8**

desire to "obtain[] sedative agents." (*Id*.)

Two days later, Defendant Dunnam referred Plaintiff to Idaho State Correctional Institution (ISCI). Dunnam referenced Dr. Salaris's report as well as Plaintiff's disrespectful and threatening behavior. (*Id*., CMS 688.) Dunnam also noted that Plaintiff had "recently admitted to writing a letter that indicated that he was manipulating staff by threatening suicide as a way to be removed from tier 3" and that Plaintiff refused to participate in his treatment plan. (*Id*.) Dunnam stated that Plaintiff did "not present with any significant Axis I disorder that should prevent [him] from programming and succeeding in any other unit." (*Id*.) Before Plaintiff was transferred out of C-3 approximately two days later, Licensed Practical Counselor Marcy Dawley noted Plaintiff's "Antisocial Personality Disorder, Borderline Personality Disorder, and Narcissism." (*Id*., CMS 199.) Dawley continued with her assessment:

> [Plaintiff] focuses on being the victim and blaming others. [Plaintiff] has been given many opportunities in the [Behavioral Health Unit at ISCI] and at IMSI C block to work on his Axis II behaviors but has refused to be involved in his treatment. [Plaintiff] has stated on numerous occasions that "if you would just give me the kind of treatment I want I would do it." He has been unwilling to participate in his own treatment as long as his conditions are not met. [Plaintiff] has previously engaged in self-harming behaviors in an attempt to get his needs met. He has admitted to making threats to self-harm or kill himself to manipulate staff to get what he wants.

(*Id*.)

**MEMORANDUM DECISION AND ORDER - 9**

**2.      Standard of Law for Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) &

**MEMORANDUM DECISION AND ORDER - 10**

(B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets this initial burden, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The

**MEMORANDUM DECISION AND ORDER - 11**

Court will grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

3.    **Standard of Law for Section 1983 Claims**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, a plaintiff must establish a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials are generally not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient

**MEMORANDUM DECISION AND ORDER - 12**

causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks, citation, and alterations omitted).

### 4.     Standard of Law for Eighth Amendment Claims

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of Defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*,

429 U.S. 97, 106 (1976). The Eighth Amendment right to adequate prison health care includes adequate mental health treatment, and the standards are the same whether the treatment is considered physical or mental. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

Regarding the objective standard for prisoners' medical care claims, the Supreme Court of the United States has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d

**MEMORANDUM DECISION AND ORDER - 14**

1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

"If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). However, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish

**MEMORANDUM DECISION AND ORDER - 15**

deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). A delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. Summary judgment is appropriate if medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury." *Toguchi*, 391 F.3d at 1061.

4.     **Analysis**

The crux of Plaintiff's claim is his contention that when he was housed in C-3, "there was absolutely no counseling and aside from the psychiatric isolation from the harsh level system there was no treatment available to [him]." (Dkt. 66-1 at 5.) However, in the 30 days Plaintiff was housed in C-3 he was evaluated at least four times: by Ms. Hansen, N.P. Hicks, Dr. Quattrocchi, and Dr. Salaris. Moreover, these formal evaluations

**MEMORANDUM DECISION AND ORDER - 16**

were in addition to Plaintiff's several meetings with the members of his treatment team where Plaintiff's behavioral and treatment plan was discussed. The undisputed facts show that Plaintiff refused to cooperate in his own mental health treatment.

There is more than sufficient evidence that Defendants Duncan and Dunnam were treating Plaintiff as best they could in the circumstances that they faced. Plaintiff's disagreement with the treatment plan recommended by his mental health treatment team and with the levels system in C-3 was just that—a disagreement, which is not actionable under § 1983. *See Sanchez*, 891 F.2d at 242. The burden thus shifts to Plaintiff to raise a genuine issue that the levels system and the behavioral and treatment plan were "medically unacceptable under the circumstances" or were "chosen in conscious disregard of an excessive risk" to Plaintiff's mental health. *Toguchi*, 391 F.3d at 1058 (internal quotation marks omitted).

Plaintiff fails to meet this burden.  Defendants endured Plaintiff's vulgar comments and threats, yet they continued to try to help Plaintiff deal with his mental health issues notwithstanding his behavior. Plaintiff claims he was subject to a "policy-driven blanket approach to the 'treatment' of all individuals" on C-3 (Dkt. 66 at 1-2), but the record definitively refutes that contention. As with all patients in C-3, Plaintiff was offered an individualized treatment plan, specifically focused toward Plaintiff's particular needs. He simply refused to follow it. Plaintiff has not shown that a genuine dispute of material fact exists, and Defendants are entitled to summary judgment.

**MEMORANDUM DECISION AND ORDER - 17**

## CONCLUSION

The mental health treatment that Plaintiff received while he was housed in C-3 satisfied the Eighth Amendment. Therefore, Defendants' Motion for Summary Judgment will be granted.

## ORDER

**IT IS ORDERED:**

1. Defendants Duncan's and Dunnam's Motion for Summary Judgment (Dkt. 61) is GRANTED, and this case is dismissed with prejudice.

2. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would be frivolous and therefore taken in bad faith. *See Coppedge v. United States*, 369 U.S. 438, 445 (1962). For this reason, Plaintiff's in forma pauperis status is REVOKED. Any further request to proceed in forma pauperis on appeal should be directed on motion to the United States Court of Appeals for the Ninth Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

DATED:  **March 12, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 18**